Hon. Ronald B. Leighton

FILED — LODGED
RECEIVED

DEC 20 2002

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY                                    DEPUTY

ENTERED
ON DOCKET

DEC 20 2002

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | NO. CR02-6064(JET)RBL |
| v. ) | **PLEA AGREEMENT** |
| UNIX LINE PTE. LTD., and ) SPRINGS NAVIGATION S.A., ) | |
| Defendants. ) | |

The United States of America, by and through John McKay, United States Attorney for the Western District of Washington, Mark Chutkow, Assistant United States Attorney for said District, and James D. Oesterle, Special Assistant United States Attorney, and Defendants, UNIX LINE PTE. LTD. ("UNIX") and SPRINGS NAVIGATION S.A. ("SPRINGS"), through their attorneys, Michael G. Chalos of Fowler, Rodriguez & Chalos and Philip R. Lempriere of Keesal, Young & Logan hereby enter into the following Agreement, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C):

1. <u>Waiver of Indictment</u>. Defendants, having been advised of the right to be charged by Indictment, agree to waive that right and enter pleas of guilty to the charges brought by the United States Attorney in an Information.

2. <u>The Charges</u>. Defendants, through their authorized representatives, having been advised of the right to have this matter tried before a jury, agree to waive that right and enter pleas of guilty to the following charges contained in the Information:

PLEA AGREEMENT/No. CR02-6064(JET)RBL - 1
UNIX LINE PTE. LTD. and SPRINGS NAVIGATION S.A.

UNITED STATES ATTORNEY
601 UNION STREET, SUITE 5100
SEATTLE, WASHINGTON 98101-39

1    a.    Count 1 of the Information, charging UNIX, by and through the

2    actions of the vessel M/T KAEDE's crew members, with knowingly and wilfully making

3    and using a false writing and document containing a materially false statement concerning

4    a matter within the jurisdiction of the United States Coast Guard, in violation of Title 18,

5    United States Code, Sections 2 and 1001; and

6    b.    Count 2 of the Information, charging UNIX and SPRINGS, by and

7    through the actions of the vessel M/T KAEDE's crew members, with negligently

8    discharging, and negligently causing the discharge of, a quantity of oil determined by

9    regulation to be harmful into a navigable water of the United States on or about October

10   22, 2002, in violation Title 33, United States Code, Sections 1319(c)(1)(A) and

11   1321(b)(3), and Title 18, United States Code, Section 2.

12   By entering their pleas of guilty, UNIX and SPRINGS hereby waive any and all

13   objections to the filed charges based on the form of the charging Information.

14   3.    Elements of the Offenses.

15   a.    Count 1 (UNIX).  The elements of the offense of making or using a

16   false writing or document containing a materially false statement as charged in Count 1,

17   in violation of Title 18, United States Code, Sections 2 and 1001, are as follows:

18          (1)    Defendant, by and through the actions of its agents and/or
              employees, used a writing or document which contained a false
19                 statement in a matter within the jurisdiction of the United States
                   Coast Guard;
20
            (2)    Defendant, by and through the actions of its agents and/or
21                 employees, acted willfully, that is deliberately and with knowledge
                   that the writing or document was untrue; and
22
            (3)    The writing or document was material to the United States Coast
23                 Guard's activities or decisions.

24   b.    Count 2 (UNIX and SPRINGS).  The elements of the offense of

25   negligently discharging a quantity of oil determined by regulation to be harmful into a

26   navigable water of the United States as charged in Count 2, in violation of Title 33,

27   United States Code, Sections 1319(c)(1)(A) and 1321(b)(3), and Title 18, United States

28   Code, Section 2, are as follows:

PLEA AGREEMENT/No. CR02-6064(JET)RBL - 2
UNIX LINE PTE. LTD. and SPRINGS NAVIGATION S.A.

UNITED STATES ATTORNEY
601 UNION STREET, SUITE 5100
SEATTLE, WASHINGTON 98101-3903

1

2     (1)    Defendant, by and through the actions of its agents and/or employees, discharged, or caused the discharge of, oil or a hazardous substance;

3

4     (2)    The amount of oil or hazardous substance discharged was a quantity deemed to be harmful by federal regulation;

5     (3)    The oil or hazardous substances was discharged into a navigable waters of the United States; and

6

7     (4)    The discharge was caused by the negligence of Defendant, by and through the actions of its agents and/or employees.

8     Under well-established principles of corporate liability and *respondeat superior*, as

9 these principles apply in this case, the corporate defendants are liable for the actions of

10 their agents and employees. *United States v. Beusch*, 596 F.2d 871 (9th Cir. 1979);

11 *United States v. Powder Puff Co.*, 163 F.2d 1008 (7th Cir. 1947); *New York Central and*

12 *Hudson River R.R. v. United States*, 212 U.S. 481, 495 (1909).

13     4.    The Penalties.  UNIX understands that the statutory penalties applicable to a

14 corporate defendant for the offense of making or using a false statement in violation of

15 Title 18, United States Code, Sections 2 and 1001, as charged in Count 1 of the

16 Information, are as follows:  a maximum fine of up to Five Hundred Thousand Dollars

17 ($500,000), a term of probation of up to five (5) years, and a special assessment of Four

18 Hundred Dollars ($400).  UNIX and SPRINGS understand that the statutory penalties

19 applicable to a corporate defendant for the offense of negligently discharging oil into a

20 navigable waters of the United States, in violation of Title 33, United States Code,

21 Sections 1319(c)(1)(A) and 1321(b)(3), and Title 18, United States Code, Section 2, as

22 charged in Count 2 of the Information, are as follows:  a maximum fine of up to Two

23 Hundred Thousand Dollars ($200,000), a term of probation of up to five (5) years, and a

24 special assessment of One Hundred Twenty-Five Dollars ($125).

25     UNIX and SPRINGS further understand that, as to each count, they may be fined

26 under the Alternative Fines Provision set forth in Title 18, United States Code,

27 Section 3571(d), which provides: "If any person derives pecuniary gain from the offense,

28 or if the offense results in a pecuniary loss to a person other than the defendant, the

PLEA AGREEMENT/No. CR02-6064(JET)RBL - 3
UNIX LINE PTE. LTD. and SPRINGS NAVIGATION S.A.

1  defendant may be fined not more than the greater of twice the gross gain or twice the

2  gross loss unless imposition of a fine under this subsection would unduly complicate or

3  prolong the sentencing process."

4       UNIX and SPRINGS agree that should the Court accept the terms of this Plea

5  Agreement, the monetary penalty imposed by the Court consistent with this

6  Rule11(c)(1)(C) Agreement, including the special assessments and the fines, shall be paid

7  at or before the time of sentencing.

8       5.    <u>Rights Waived by Pleading Guilty</u>.  UNIX and SPRINGS understand that,

9  by pleading guilty, they knowingly and voluntarily waive the following rights:

10           a.    The right to plead not guilty, and to persist in a plea of not guilty;

11           b.    The right to a speedy and public trial before an impartial jury;

12           c.    The right to the effective assistance of counsel at trial;

13           d.    The right to be presumed innocent until guilt has been established at

14  trial, beyond a reasonable doubt;

15           e.    The right to confront and cross-examine witnesses against them at

16  trial;

17           f.    The right to compel or subpoena witnesses to appear on their behalf

18  at trial; and

19           g.    The right to appeal a finding of guilt or any pretrial rulings.

20       6.    <u>Applicability of Sentencing Guidelines</u>.  UNIX and SPRINGS understand

21  and acknowledge that the United States Sentencing Guidelines promulgated by the United

22  States Sentencing Commission are applicable to the sentencing in this case, except that

23  pursuant to USSG §§ 8C2.1, Chapter 8 of the United States Sentencing Guidelines is not

24  applicable to the  determination of the appropriate fine in this case.

25       7.    <u>Sentencing Agreement</u>.  Pursuant to Federal Rule of Criminal

26  Procedure 11(c)(1)(C), the United States, UNIX and SPRINGS agree that the sentence to

27  be imposed by the Court shall be as follows:

28

PLEA AGREEMENT/No. CR02-6064(JET)RBL - 4
UNIX LINE PTE. LTD. and SPRINGS NAVIGATION S.A.

UNITED STATES ATTORNEY
601 Union Street, Suite 5100
Seattle, Washington 98101-3903

1        a.      <u>Fine</u>. UNIX shall pay a fine in the amount of Five Hundred Fifty

2    Thousand Dollars ($550,000) – Three Hundred Fifty Thousand Dollars ($350,000) for

3    Count 1 and Two Hundred Thousand Dollars ($200,000) for Count 2 – which includes an

4    amount paid in the form of community service as described below, which fine and

5    community service payment are due and payable at the time of sentencing.  SPRINGS

6    shall pay a fine in the amount of Two Hundred Thousand Dollars ($200,000) which fine

7    is due and payable at the time of sentencing.

8        b.      <u>Mandatory Special Assessment</u>. UNIX shall pay a special

9    assessment of Four Hundred Dollars ($400) for Count 1. UNIX and SPRINGS shall each

10   pay a special assessment of One Hundred Twenty Five Dollars ($125) for Count 2. All of

11   the special assessments are due and payable at the time of sentencing.

12       c.      <u>Probation</u>. UNIX and SPRINGS will be placed on organizational

13   probation for a period of four years pursuant to USSG §§ 8D1.1 and 8D1.2. UNIX and

14   SPRINGS may petition for early termination of probation after the passage of three years

15   of successful performance on probation. The government reserves the right to concur,

16   oppose, or take no position with respect to such early termination. The terms of probation

17   shall include the following specific provisions, in addition to the Court's standard

18   conditions:

19       (1)     <u>No Further Violations</u>. Defendants agree that they shall

20   commit no further violations of federal, state or local law, including those laws and

21   regulations for which primary enforcement has been delegated to state authorities, and

22   shall conduct all their operations in accordance with the MARPOL Protocol. The United

23   States Attorney's Office for the Western District of Washington will not consider as a

24   violation of probation any minor deficiencies noted during U.S. Coast Guard vessel

25   examinations that are not regularly submitted by the U.S. Coast Guard for civil or

26   criminal action. The government's position on whether a subsequent violation is an

27   appropriate basis for a probation violation does not bind the United States Probation

28   Office or the Court. Nothing herein shall prohibit the United States from proceeding

PLEA AGREEMENT/No. CR02-6064(JET)RBL - 5
UNIX LINE PTE. LTD. and SPRINGS NAVIGATION S.A.

1  administratively, civilly, or criminally against Defendants in any separate proceeding for

2  any alleged subsequent environmental violations.

3             (2)    Environmental Management System/Compliance Plan.

4  Defendants agree to develop, adopt, implement and fund a comprehensive Environmental

5  Management System/Compliance Plan ("EMS") during their terms of probation, the

6  terms of which shall be agreed upon between Defendants and the government, and which

7  shall be substantially similar to Defendants' draft proposed EMS attached hereto as

8  Exhibit A. Defendants agree that the EMS will comply with the special conditions of

9  probation outlined below, and that the Standards and Requirements for the EMS, agreed

10  to by the United States, will be filed with the Court as an attachment to this Agreement on

11  or before the date of sentencing. Defendants understand and agree that if the Standards

12  and Requirements for the EMS are not agreed upon by the date of sentencing, the United

13  States, acting in good faith, reserves the right to withdraw from this Agreement and

14  pursue all charges for which there is probable cause. If Defendants change their names,

15  re-organize, merge, or otherwise cease operations in their current form, the person or

16  entity acquiring the assets or taking over the operation of the Defendant(s) shall take over

17  the responsibility to develop, implement, fund and maintain the EMS, provided that the

18  person or entity acquiring the assets or taking over the operations are wholly or partially

19  owned or controlled, directly or indirectly, by UNIX and/or SPRINGS, their parent

20  companies, affiliates, successors in interest or assigns.

21           a.     The EMS will establish that: all environmental and related operational risks

22  have been identified; such risks are being appropriately managed and potential risks are

23  being avoided; all international, federal, state and local laws, regulations, and

24  *environmental permit requirements are being adhered to; appropriate policies, programs*

25  and procedures are in place; organizational responsibilities are clearly defined,

26  understood and implemented; environmental quality control assurance and verification

27  systems are in place, as determined by appropriate self-policing and third-party audits;

28  company operations, including contractor operations and on-site service provider

PLEA AGREEMENT/No. CR02-6064(JET)RBL - 6
UNIX LINE PTE. LTD. and SPRINGS NAVIGATION S.A.

UNITED STATES ATTORNEY
601 UNION STREET, SUITE 5100
SEATTLE, WASHINGTON 98101-3903

1   operations, do not present actual risks to the environment. Defendants shall ensure that

2   the environmental compliance program is diligently enforced by their officers and

3   managers.

4          b.      Defendants shall be responsible for all costs associated with the

5   development, implementation, maintenance and monitoring of the EMS.

6          c.      During the period of probation, an independent auditor shall monitor and

7   ensure Defendants' compliance with the Plea Agreement and probation conditions and

8   the development, implementation and maintenance of the EMS in accord with the

9   Standards and Requirements filed with the Court. The independent auditor will be

10  approved by the Court, United States Attorney's Office, and United States Coast Guard.

11  Three names will be provided by Defendants to the United States for consideration. If

12  none are acceptable to the United States, then Defendants will provide the United States

13  with three more names. Once a proposed candidate is agreed upon by the parties, the

14  parties will file a stipulation and proposed order regarding that candidate for the Court's

15  approval. Defendants will assume all costs and expenses associated with the employment

16  and expenses of the auditor. Defendants agree to provide the auditor with unrestricted

17  access to all vessels listed in the EMS, to all facilities, employees, documents and

18  computers, relevant to monitoring of the vessels listed in the EMS, and to facilitate access

19  to contractors and contractor employees in respect thereto. All reports issued by the

20  auditor will be filed with the Court. In addition, all reports and draft reports issued by the

21  auditor will be delivered to the Probation Office, United States Attorney's Office and the

22  United States Coast Guard prior to or simultaneously with delivery to Defendants.

23                 (3)    Access. Defendants agree that during the period of probation,

24  and at all reasonable times and with as reasonable prior notice by the United States as

25  practicable, they will provide the United States with full access to their vessels listed in

26  the EMS, as well as, all facilities, employees, and records that are relevant to monitoring

27  compliance with the terms and conditions of the EMS.

28

1            d.   <u>Community Service</u>. The parties further agree, pursuant to

2 Rule 11(c)(1)(C), that execution of a portion of the Three Hundred Fifty Thousand

3 Dollars ($350,000) fine payable by UNIX in respect to Count 1, the amount of up to

4 Three Hundred Thousand Dollars ($300,000), shall be suspended for the express purpose

5 of UNIX applying this amount to performing community service pursuant to USSG §

6 8B1.3, and in furtherance of the sentencing principles provided in 18 U.S.C. § 3553(a).

7 The explicit goal of the community service requirement to be imposed on UNIX shall be

8 to fund one or more projects for the benefit, preservation, and restoration of the

9 environment and ecosystems in the waters of the United States adjoining the coastline of

10 Washington State. The specific project or projects are to be determined before imposition

11 of sentencing in this case. The projects may be proposed by UNIX but must be approved

12 by the United States Attorney's Office for the Western District of Washington.

13        *Because the above payments are designated as community service by an*

14 *organization,* UNIX further agrees that it will not seek any reduction in their tax

15 obligations as a result of these community service payments. In addition, since these

16 payments constitute community service as part of the total fine amount agreed upon in

17 this Agreement, UNIX will not characterize, publicize or refer to these community

18 service payments as voluntary donations or contributions.

19        8.   <u>Application of the Agreement</u>. This Agreement shall bind UNIX and

20 SPRINGS and their successors and assigns. UNIX and SPRINGS, or their successors-in-

21 interest, if applicable, shall provide the United States Attorney's Office for the Western

22 District of Washington and the United States Probation Office for the Western District of

23 Washington with immediate notice of any name change, business reorganization, sale or

24 purchase of assets, divestiture of assets, or similar action impacting their ability to pay the

25 fine or affecting this Agreement and the EMS. No change in name, change in corporate

26 or individual control, business reorganization, change in ownership, merger, change of

27 legal status, sale or purchase of assets, or similar action shall alter Defendants

28

PLEA AGREEMENT/No. CR02-6064(JET)RBL - 8
UNIX LINE PTE. LTD. and SPRINGS NAVIGATION S.A.

UNITED STATES ATTORNEY
601 UNION STREET, SUITE 5100
SEATTLE, WASHINGTON 98101-3903

1  responsibilities under this Agreement.  Defendants shall not engage in any action to seek

2  to avoid the obligations and conditions set forth in this Agreement.

3         9.    Statement of Facts.  The parties agree on the following facts in support of

4  Defendants' guilty pleas.  Defendants admit that they are guilty of the charged offenses.

5  •    *Background*

6     o    SPRINGS NAVIGATION S.A. ("SPRINGS"), is a Panamanian company
with corporate headquarters in the Republic of Panama.  SPRINGS owns a
7  number of ocean going vessels, including the Motor Tanker (M/T) KAEDE.
The M/T KAEDE, identified as I.M.O. 8130083, is a 13,539 gross ton bulk
8  chemical tanker vessel built in 1982.

9     o    UNIX LINE PTE., LTD. ("UNIX") is a ship management company,
incorporated and headquartered in Singapore.  Acting both directly and
10  through its agents, UNIX manages and operates a fleet of ocean going
vessels, including chemical tankers that transport chemical products around
11  the world, including to and from United States ports.  UNIX operates its
vessels by and through management and manning agents, including Dong
12  Jin Marine Shipping Company, located in South Korea, and Visco, located
in the People's Republic of China. UNIX contracts with the manning agents
13  for the hiring of crews for each of the vessels that it manages and operates.

14     o    UNIX manages and operates the M/T KAEDE.  Over the last several years,
the M/T KAEDE has made a number of port calls in the United States,
15  including ports in the Western District of Washington.  UNIX and
SPRINGS are jointly responsible for the safe operation of the M/T KAEDE
16  and for ensuring that the vessel complies with all international laws and the
laws of the United States when the vessel sails into or affects United States
17  waters.

18     o    The M/T KAEDE typically operates with a crew of approximately twenty-
one seamen.  Eight seamen of different rank work in the vessel's engine
19  room, including a Chief Engineer, a First Engineer, a Second Engineer, a
Third Engineer and four Oilers.  During the time relevant to this
20  Agreement, Chief Engineer Hyeong-Bin Jeong had overall responsibility
for engine room operations and reported directly to the Captain, who was
21  responsible for all vessel operations.  Each Engineer is paired with one
Oiler and together they work two four-hour shifts per day.

22

23     o    Large ocean going vessels, like the M/T KAEDE, produce waste oil as a
result of the operation of machinery in the engine room. Some of the waste
oil, together with water and other liquids, accumulates in the bottom or
24  "bilges" of the vessel within the engine room.  This waste liquid typically
drains into the "bilge wells," small compartments set into the bottom of the
25  engine room compartment.  The bilge waste is then collected and run
through various processes designed to separate the oil and other wastes
26  from the water.  These processes include settling tanks and an "Oil Water
Separator" (also known as a Bilge Water Separator), a pollution control
27  device designed to remove or separate out oil.  After processing by the Oil
Water Separator, bilge water containing fifteen (15) parts per million or less
28  of oil may be legally discharged overboard.  Oil removed from the bilge
waste, along with other waste oils from the ship, are stored in a sludge tank.

UNITED STATES ATTORNEY
601 UNION STREET, SUITE 5100
SEATTLE, WASHINGTON 98101-3903

1    Some ships burn the sludge in an incinerator or in the vessel's auxiliary
     boiler. Oil contaminated bilge waste and other waste oils, including sludge,
2    may also be off-loaded while the vessel is in port and properly disposed of
     onshore.

3
     o    The Federal Water Pollution Prevention and Control Act (the "Clean Water
4         Act"), as amended by the Oil Pollution Act of 1990, makes it a crime,
          among other things, to knowingly discharge oil in quantities determined by
5         regulation to be harmful in "navigable waters" of the United States
          (i.e., within three miles seaward of the low tide mark of the nation's shores)
6         and in waters of the "contiguous zone" of the United States (i.e., within
          approximately twelve (12) miles of the nation's shores). 33 U.S.C.
7         §§ 1321(b)(3), 1319(c)(2), 1362(7, 8, 9); 33 C.F.R. § 2.05-15.

8    o    The Clean Water Act, as amended by the Oil Pollution Act, contains an
          exception for discharges allowed by the MARPOL Protocol an
9         international treaty implemented in the United States by the "Act to Prevent
          Pollution from Ships" ("APPS"). 33 U.S.C. 1901, et seq. Under
10        MARPOL, the maximum amount of oil a ship may discharge overboard is
          fifteen (15) parts per million ("ppm") of oil.

11
     o    The MARPOL Protocol and the APPS require that each oil tanker of
12        150 gross tons or more, or non-tanker vessels of more than 400 gross tons,
          maintain an "Oil Record Book" (or "ORB"). All transfers of oil, disposal
13        of sludge and bilge water, and overboard discharges of bilge water that have
          accumulated in machinery spaces and are thus contaminated with oil, must
14        be fully recorded in the ORB. 33 C.F.R. § 151.25(d). The Captain of the
          ship must sign every completed page of the Oil Record Book. Id.
15        at § 151.25(h). The Oil Record Book must be maintained on board for not
          less than three years and must be kept onboard the vessel readily available
16        at all reasonable times.

17   o    Federal regulations authorize the U.S. Coast Guard to board and inspect all
          vessels in United States ports to determine compliance with federal
18        regulations and the MARPOL Protocol. 14 U.S.C. § 89, 33 C.F.R.
          § 151.25. The inspection typically includes an examination of the ORB.
19        The U.S. Coast Guard relies upon the accuracy of information contained in
          the ORB to assist in assessing the vessel operator's compliance with all
20        applicable rules and regulations.

21   •  *Factual Basis Specific to Count One*

22   o    On October 6, 2002, the M/T KAEDE departed from Ulsan, South Korea
          for the purpose of transporting chemical products to Tacoma, Washington.
23        Several days into the voyage, Chief Engineer Hyeong-Bin Jeong directed
          other engine crew members to fabricate a flexible hose for the purpose of
24        bypassing the Oil Water Separator and discharging untreated waste oil
          directly overboard. Chief Engineer Jeong further instructed engine room
25        crew members to connect one end of the flexible hose to the bilge pump and
          the other end to the sewage overboard discharge valve. Once connected,
26        the pump was activated, discharging oily waste through the hose directly
          overboard into the ocean. The flexible hose was detached by crew members
27        shortly before the M/T KAEDE arrived in Tacoma, Washington, with
          Chief Engineer Jeong's knowledge and approval.

28

UNITED STATES ATTORNEY
601 UNION STREET, SUITE 5100
SEATTLE, WASHINGTON 98101-3903

○ None of the discharges that occurred through the flexible hose were recorded in the ORB. In addition to these omissions, UNIX by and through the actions of the vessel's crew, is vicariously deemed to have knowingly made false entries in the ORB in an effort to conceal the fact that oily waste had been discharged directly overboard. The omissions and false entries created the impression that oily waste generated onboard the M/T KAEDE was being managed correctly in accordance with applicable regulations.

○ On October 21, 2002, the M/T KAEDE arrived at the Pioneer Americas Chemical ("Pioneer") transfer facility, along the Hylebos Waterway in Commencement Bay, in Tacoma, Washington, and docked with her starboard side to the pier. On October 22, 2002, U.S. Coast Guard inspectors boarded the M/T KAEDE in connection with an investigation to determine the source of an apparent oil spill in the Hylebos Waterway, next to the vessel. In order to determine the origin of the spill, as well as the vessel's compliance with Federal law and the MARPOL Protocol, Coast Guard inspectors examined the Oil Water Separator, associated piping and valves, the ship's various fuel and waste tanks, and the vessel's operating records, including the Oil Record Book.

○ The Oil Record Book presented to the inspectors during their investigation of the oil spill contained materially false statements and omissions, in that it omitted any reference to the fact that the engine crew members of the vessel had discharged oily waste directly overboard into the ocean en route from South Korea to Tacoma, bypassing the Oil Water Separator. UNIX, by and through the actions of the vessel's crew, is deemed to have vicariously known at the time the entries in the Oil Record Book were entered, initialed and presented that, in truth and in fact, oily wastes had been discharged into the ocean, bypassing the Oil Water Separator. Moreover, UNIX, by and through the actions of the vessel's crew, is deemed to have vicariously known that these false entries and omissions were material to the enforcement and regulatory duties of the U.S. Coast Guard.

● *Factual Basis Specific to Count Two*

○ On or about October 21, 2002, as the M/T KAEDE began off-loading bulk caustic soda slurry to the Pioneer facility, an engine room crew member turned on the vessel's sewage system in conformity with applicable federal and state regulations. Activation of the system forced a quantity of oily waste to flush out of the starboard-side sewage system. The oily waste remained in the system following detachment of the flexible bypass hose and was inadvertently, although negligently, discharged through the sewer system directly to the Hylebos Waterway in Commencement Bay, a navigable water of the United States.

○ At around 9:00 a.m. on October 22, 2002, crew members of the M/T KAEDE observed an oil slick in the waterway, stretching from the stern to the midship of the starboard side of the vessel. The Chief Officer *notified Pioneer personnel of the spill, who, in turn, notified the National Response Center of a 500-foot by 50-foot wide oil sheen in the waterway.* That afternoon, U.S. Coast Guard officers arrived at the pier and observed what appeared to be heavy fuel oil in the waterway between the vessel and the pier, measuring about 250 feet by 30 feet in size. About an 18 inch wide strip of sticky dark black oil adhered to the starboard (pier) side hull of the tanker, slightly above her waterline, extending about 75 yards from the stern to the midship.

PLEA AGREEMENT/No. CR02-6064(JET)RBL - 11
UNIX LINE PTE. LTD. and SPRINGS NAVIGATION S.A.

UNITED STATES ATTORNEY
601 UNION STREET, SUITE 5100
SEATTLE, WASHINGTON 98101-3903

1    ○    Federal investigators collected oil samples from several tanks onboard the
          M/T KAEDE, as well as from the waterway. An analysis of the samples
2         disclosed that the oil in the waterway exhibited characteristics that matched
          characteristics of the oil found onboard the M/T KAEDE.
3
     ○    UNIX and SPRINGS, by and through the actions of the vessel's crew,
4         negligently discharged, or negligently caused to be discharged, this oil into
          or upon the Hylebos Waterway in Commencement Bay, a navigable water
5         of the United States, in an amount determined by regulation to be harmful.

6    10.   Cooperation. The government recognizes and acknowledges that both

7   UNIX and SPRINGS reported this incident to the United States government and the

8   vessel's flag-state before they had been notified by the government of its investigation of

9   the matter. UNIX and SPRINGS cooperated during the government's search of the

10  M/T KAEDE, including consenting to a search of an area of the vessel not otherwise

11  covered by the search warrant. UNIX and SPRINGS expeditiously provided documents

12  requested by the government investigators. UNIX and SPRINGS also provided housing

13  and meal arrangements for the crew, as well as security guard services for the crew

14  members who did not hold visas. Both UNIX and SPRINGS have fully cooperated with

15  the government in the investigation and settlement process.

16  11.   Non-Prosecution of Additional Offenses. As part of this Plea Agreement

17  and solely because of the promises made by Defendants in this Agreement, the United

18  States Attorney's Office for the Western District of Washington agrees not to prosecute

19  UNIX and/or SPRINGS for any additional offenses that arise out of the conduct giving

20  rise to this investigation.

21  Nothing contained in this Agreement is meant to limit the rights and authority of

22  the United States to take further civil or administrative action against UNIX and

23  SPRINGS, including but not limited to, any listing and debarment proceedings to restrict

24  rights and opportunities of UNIX and SPRINGS to contract with or receive assistance,

25  loans, and benefits from United States agencies. The parties understand, however, that

26  based on information known to the United States Coast Guard, Thirteenth Legal District,

27  that agency does not intend to pursue any civil penalties based upon the subject matter of

28  this Agreement.

PLEA AGREEMENT/No. CR02-6064(JET)RBL - 12
UNIX LINE PTE. LTD. and SPRINGS NAVIGATION S.A.

1       This plea agreement does not limit the right of UNIX and SPRINGS or the United

2   States to speak at the time of sentencing or in connection with the presentence

3   investigation, consistent with the provisions set forth in this plea agreement, to provide

4   the Court or the United States Probation Office with evidence of all relevant conduct

5   committed by Defendants.  The parties agree that at sentencing each will support the

6   agreed disposition set forth in this Plea Agreement pursuant to Federal Rule of Criminal

7   Procedure 11(c)(1)(C).

8       12.    Corporate Authorization.  UNIX and SPRINGS represent that they are

9   authorized to enter into this Agreement.  On or before the date of entry and filing of the

10  Plea Agreement, UNIX and SPRINGS shall each provide to the United States and the

11  Court a written statement in the form of notarized legal documents certifying that

12  Defendant companies are authorized to enter into and comply with all of the provisions of

13  this Plea Agreement.  The resolutions further shall certify that the Presidents or Chief

14  Operating Officers, or their designees, are authorized to take these actions and that all

15  corporate formalities for such authorizations have been observed.

16      13.    Waiver of Appeal.  UNIX and SPRINGS are aware that 18 U.S.C. § 3742

17  gives the right to appeal the sentence to be imposed, and that other federal statutes give a

18  defendant the right to appeal other aspects of the conviction.  In consideration of the

19  agreement of the United States as set forth herein, UNIX and SPRINGS knowingly and

20  voluntarily agree to waive the following rights:

21          a.      The right, conferred by 18 U.S.C. § 3742, to appeal any sentence

22  imposed by the Court for the conviction of these offenses;

23          b.      The right to appeal any aspect of Defendants' conviction, including

24  any pre-charge or pre-trial dispositions of motions or other issues; and

25          c.      The right to bring any collateral attack against UNIX and

26  SPRINGS's conviction or sentence, except as it may relate to the effectiveness of legal

27  representation.

28

PLEA AGREEMENT/No. CR02-6064(JET)RBL - 13
UNIX LINE PTE. LTD. and SPRINGS NAVIGATION S.A.

14.   <u>Voluntariness of the Plea</u>. UNIX and SPRINGS acknowledge that they have entered into this Plea Agreement freely and voluntarily and that they have been fully advised by counsel, and that no threats or promises were made to induce them to enter into the guilty pleas called for by this Agreement.

15.   <u>Statute of Limitations</u>. In the event that this Agreement is not accepted by the Court for any reason, or Defendants have breached any of the terms of this Plea Agreement, the statute of limitations shall be deemed to have been tolled from the date of the Plea Agreement to: (1) 30 days following the date of non-acceptance of the Plea Agreement by the Court; or (2) 30 days following the date on which a breach of the Plea Agreement by Defendants is discovered by the United States Attorney's Office.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

PLEA AGREEMENT/No. CR02-6064(JET)RBL - 14
UNIX LINE PTE. LTD. and SPRINGS NAVIGATION S.A.

UNITED STATES ATTORNEY
601 UNION STREET, SUITE 5100
SEATTLE, WASHINGTON 98101-3903

16. <u>Completeness of Agreement</u>. The United States and Defendants acknowledge that these terms constitute the entire Plea Agreement between the parties. This Agreement only binds the United States Attorney's Office for the Western District of Washington. It does not bind any other United States Attorney's Office or any other office or agency of the United States, or any state or local prosecutor, except as provided herein.

Dated this **20ᵗʰ** day of **December**, 2002.

FOR THE UNITED STATES:                    FOR DEFENDANTS:


FLOYD G. SHORT *By msc*                    HIDEAKI OKABE
Assistant United States Attorney           Managing Director
                                           UNIX LINE PTE. LTD.


MARK CHUTKOW                               HIROSHI CHIKAZAWA
Assistant United States Attorney           Director/Treasurer
                                           SPRINGS NAVIGATION S.A.


JAMES D. OESTERLE                          MICHAEL G. CHALOS
Special Assistant United States Attorney   Fowler, Rodriguez & Chalos
                                           Co-Counsel for UNIX LINE PTE. LTD.
                                           and SPRINGS NAVIGATION S.A.


                                           PHILIP R. LEMPRIERE
                                           Keesal, Young & Logan
                                           Co-Counsel for UNIX LINE PTE. LTD.
                                           and SPRINGS NAVIGATION S.A.

UNITED STATES ATTORNEY
601 UNION STREET, SUITE 5100
SEATTLE, WASHINGTON 98101-3903

# EXHIBIT A

## DRAFT ENVIRONMENTAL MANAGEMENT SYSTEM/COMPLIANCE PROGRAM

United States v. Unix Line Pte. Ltd. CR02-6064(JET)RBL

# EXHIBIT A

## SPRINGS NAVIGATION, S.A. AND  UNIX LINES PTE. LTD.
## ENVIRONMENTAL MANAGEMENT SYSTEM/COMPLIANCE PROGRAM

The following standards and requirements for an ENVIRONMENTAL MANAGEMENT SYSTEM/COMPLIANCE PROGRAM (EMS/CP) have been prepared pursuant to the Plea Agreement between Springs Navigation, S.A. and Unix Lines Pte. Ltd. (hereinafter "Defendants") and the United States (hereinafter "Government") filed in the United States District Court for the Western District of Washington. Compliance with all of the standards and requirements of the EMS/CP is an essential term of the Plea Agreement.

The EMS/CP includes various provisions to ensure that all vessels listed in Attachment "A" hereto, which are directly or indirectly owned, operated, managed, manned and/or controlled by Springs Navigation, S.A. and Unix Lines Pte. Ltd. comply with all maritime safety and environmental requirements established under applicable international, flag state, and port state law, including, but not limited to, and without limitation, the International Convention for the Safety of Life at Sea (SOLAS), the International Safety Management (ISM) Code, the International Convention for Prevention of Pollution from Ships (MARPOL), and all applicable Federal and state statutes and regulations including, but not limited to, and without limitation, the Ports and Waterways Safety Act (PWSA), the Act to Prevent Pollution from Ships (APPS), the Clean Water Act (CWA) and the Oil Pollution Act (OPA).

## A. APPLICABILITY/PURPOSE

(1)     This EMS/CP shall cover and apply to all of the Defendants' operations, including all subsidiaries, affiliated business entities, and agents (owned wholly or partially by the Defendants), involved in the operation of seagoing vessels listed in Attachment "A" hereto, which are owned, operated, and/or manned by the Defendants, on the date of sentencing or at anytime during the period of probation. It shall also include all persons working for the Defendants, their subsidiaries, affiliated business entities, and agents, and who are involved in the operation of aforesaid seagoing vessels, owned, operated, and/or manned by the Defendants, as direct employees or independent contractors, on the date of sentencing or at any time during the period of probation.

(2)     The EMS/CP is not intended to replace the ISM Code, or any other applicable international legal requirement or United States statute and regulation. The purpose of this EMS/CP is to augment the requirements of



existing law by increasing inspections and audits of Defendants' vessels listed in Attachment "A" hereto, shore side facilities and operations involving said vessels; increase training of all of Defendants' personnel involved with said vessels; develop and implement management and engineering controls to detect and prevent safety and environmental violations; and require periodic reports to the United States District Court for the Western District of Washington, the United States Attorney's Office for the Western District of Washington, the Environmental Protection Agency, Seattle Office and the Coast Guard (hereinafter "the United States") to ensure that the Defendants are following this EMS/CP and that all vessels directly or indirectly owned, operated, managed, manned and/or controlled b y Defendants comply with all maritime safety and environmental requirements established under applicable international, flag state, and port state law and all applicable Federal and state statutes and regulations.

## B. CORPORATE COMPLIANCE MANAGER

(1)     Within thirty (30) days of entry of the Plea Agreement, the Defendants shall designate a senior corporate officer as Corporate Compliance Manager (hereinafter "Compliance Manager") who shall report directly to the President and/or Managing Director of defendants. Defendants shall provide the name of the Compliance Manager to the United States. The Compliance Manager should be the same individual as Defendants' "designated person" under the International Safety Management Code (hereinafter "ISM") unless reasons are provided to the United States justifying why the "designated person" should not also be the Compliance Manager. The Compliance Manager shall be responsible for coordinating with the Independent Auditor, as more fully described below, developing and implementing all of the systems required herein; establishing and implementing training programs for the officers and crew of Defendants' vessels listed in Attachment "A", ensuring that audits and surveys are carried out as required and ensuring that all documents are properly maintained and that reports are made on a timely basis to the Independent Auditor and the United States. All reports required under this EMS/CP shall be reviewed by the Compliance Manager and signed under the penalty of perjury.

(2)     Defendants shall establish a procedure that requires all officers, crewmembers and employees, and shore side personnel involved in the ownership, manning, and/or operation of seagoing vessels of the Defendants listed in Attachment "A" hereto, including all persons working for the Defendants, its subsidiaries, affiliated business entities (owned wholly or partially by the Defendants) and agents of the Defendants as either direct employees or independent contractors, to notify the Compliance Manager of any violations of any applicable environmental requirements and to cooperate fully with the Independent Auditor and the

United States in carrying out their auditing and oversight functions required by applicable law and this EMS/CP. Defendants agree to establish a procedure that makes failure to notify the Compliance Manager of any violations of any applicable environmental requirements and failure to cooperate fully with the Classification Societies, the Independent Auditor and the United States in carrying out their auditing and oversight functions required by applicable law and this EMS/CP, grounds for dismissal. Defendants agree not to retaliate against any officer, crewmember, employee, or shore side personnel involved in the ownership, manning, and/or operation of seagoing vessels listed in Attachment "A", including all persons working for the Defendants, its subsidiaries, affiliated business entities (owned wholly or partially by the Defendants) and agents of the Defendants as either direct employees or independent contractors or entity making any such report.

## C. INDEPENDENT AUDITOR AND INITIAL EMS REVIEW

(1)    Within thirty (30) days of sentencing in this case, the Defendants shall appoint an Independent Auditor who meets the qualifications below to conduct an Initial EMS Review and Evaluation and Report of Findings for all Defendants' operations as defined below. The appointment of the Independent Auditor shall be subject to the approval of the United States, which approval shall not be unreasonably withheld. The Independent Auditor shall conduct a review and evaluation of Defendants' operations (vessel and shore side) involved in the ownership, manning, and/or operation of seagoing vessels as they relate to environmental issues. The review and evaluation shall include, but not be limited to safety management systems, maintenance systems, pollution control systems, (including use, capabilities and condition of the Oil Water Separators on board Defendants' vessels listed in Attachment "A" hereto, and completeness of Oil Record Books on board Defendants' said vessels) and management systems as they relate to environmental issues. At the conclusion of the Initial EMS Review and Evaluation, but in no event later than ninety (90) days following imposition of sentence, the Independent Auditor shall prepare a Report of Findings. The Report of Findings shall be provided to the Defendants and the United States. Based on the Report of Findings, the Defendants shall develop an EMS/CP manual. (See below)

(2)    Qualifying candidates for the Independent Auditor position must have expertise and competence in the regulatory programs under U. S. and international marine safety and environmental laws, and have expertise and

⑲

competence in the areas involved in the Defendants' operations. The Independent Auditor must not directly own any stock in any of the Defendants, their subsidiaries, affiliated business entities (owned wholly or partially by the Defendants) or any agents of the Defendants, and must have no other direct financial stake in the outcome of duties conducted pursuant to this Plea Agreement. The Independent Auditor must be capable of exercising the same independent judgment and discipline that a certified public accounting firm would be expected to exercise in auditing a publicly held corporation. If Defendants have any other contractual relationship with the Independent Auditor, both Defendants and the Independent Auditor shall disclose to the Government such past or existing contractual relationships. The Government will notify the Defendants in writing of its approval or disapproval as expeditiously as possible.

(3)    If the Government determines that the proposed Independent Auditor does not meet the qualifications set forth in the previous paragraph, or that past or existing relationships with the Independent Auditor would affect the Independent Auditor's ability to exercise the independent judgment and discipline required to conduct the EMS audit, such Independent Auditor shall be disapproved and another Independent Auditor shall be proposed by the Defendants within thirty (30) days of the Defendants' receipt of the Government's disapproval.

(4)    The Independent Auditor will conduct bi-annual shore side and shipboard audits of each waste stream at all facilities and on all vessels listed in Attachment "A" hereof, to verify compliance with applicable laws, regulations, and the EMS. Each of the Defendants' aforesaid vessels and facilities shall be audited every two years, although the audits can be conducted on a serial basis. The Independent Auditor will determine which vessels it will audit. At all times, the Independent Auditor will have full access to Defendants' employees and officers. The Defendants shall immediately advise the Independent Auditor of any issues that come to their attention that adversely impacts the Defendants' compliance with the EMS.

(5)    All audits shall be conducted, as much as it practicable under the circumstances,  in accordance with the principles set forth in ISO 9000 and ISO 14011, using IS014012 as supplemental guidance. The Independent Auditor shall assess conformance with the elements specified above and with the EMS Manual. Designated United States representatives may participate in the EMS audit as observers at Government expense. The Defendants shall make timely notification to the United States regarding audit scheduling in order to make arrangements for observers to be present.



(6)     The Independent Auditor shall deliver each vessel's and facilities' audit report to the appropriate company official upon completion. In addition, the Independent Auditor will deliver an audit report to the designate representative of the United States within thirty days after the completion of each report. If the Independent Auditor believes that additional time is needed to analyze available information or to gather additional information, the Defendants may request that the Government grant the Independent Auditor such additional time as needed to prepare and submit the Audit Report. If necessary, the Government may grant additional time in 30 day increments for completion of the Audit Report. Should the Government or the United States Probation Office seek to revoke the Defendants' probation based on the Independent Auditor's failure to file a timely Audit Report, the Defendants shall have the right to contest the reasonableness of such revocation

(7)     The Audit Report shall present the Audit Findings and shall, at a minimum, contain the following information:

a)     Audit scope, including the time period covered by the audit;

b)     The date(s) the on-site portion of the audit was conducted;

c)     Identification of the audit team members;

d)     Identification of the company repress and regulatory personnel observing the audit;

e)     The distribution forth e EMS Audit Report;

f)     A summary of the audit process, including any obstacles encountered;

g)     Detailed Audit Findings, including the basis for each finding and the Area of Concern identified;

h)     Identification of any Audit Findings corrected or Areas of Concern addressed during the audit, and a description of the corrective measures and when they were implemented;

i)     Certification by the Independent Auditor that the EMS Audit was conducted in accordance with the provisions of the EMS.

(8)     Within 30 days from completion of the EMS audit, the Defendants shall develop and submit to the United States, for review and comment, an Action Plan for expeditiously bringing the Defendants into full conformance with the EMS provisions in this agreement and the EMS

manual. The Action Plan shall include the result of any root cause analysis, specific deliverables, responsibility assignments, and an implementation schedule. The Defendants may request that the United States permit a brief *extension of the time limit* stated above on a case by case basis. Such permission shall not be unreasonably withheld.

(9)   The Action Plan shall be reviewed by the designated representative of the United States who shall provide written comments within thirty days of receipt. After making any necessary modifications to the Action Plan based on the comments, the Defendants shall implement the Action Plan in accordance with the schedules set forth therein. Within thirty days after all items in the Action Plan have been completed, the Defendants shall submit a written Action Plan Completion Certification to the United States.

## D. EMS/CP MANUAL

(1)   Within three months of receiving the Initial EMS Review and *Report of Findings* from the Independent Auditor, Defendants shall prepare an EMS/CP manual, which shall describe and document the EMS and contain an EMS implementation schedule for each of the described systems. For each of the elements described below, the manual shall describe the EMS in detail, by explaining how the activity or program is or will be (a) established as a formal system or task, (b) integrated into ongoing department operations, and (c) continuously evaluated and improved.

### I. Environmental Policy

- This policy, upon which the EMS/CP is based, must clearly communicate Defendants' commitment to achieving compliance with all applicable U.S. and International environmental statutes, regulations, enforceable agreements, and permits (hereafter, "environmental requirements"), minimizing risks to the environment from unplanned contaminant releases, and continual improvement in environmental performance. *The policy should also state* management's intent to provide adequate personnel and other resources for the EMS/CP.

### II. Organization, Personnel, and Oversight of EMS

- Describes, organizationally, how the EMS/CP is implemented and maintained.



- Includes organization charts, as appropriate, that identify units, line management, and other individuals having environmental performance, risk reduction, and regulatory compliance responsibilities.

- Identifies and defines specific duties, roles, responsibilities, and authorities of key environmental program personnel in implementing and sustaining the EMS/CP (e.g., could include position descriptions and performance standards for all environmental staff, and excerpts from others having specific environmental program and regulatory compliance responsibilities).

- Includes ongoing means of communicating environmental issues and information to all organization personnel, contractors, and consultants, and for receiving and addressing their concerns.

### III. Accountability and Responsibility

- Specifies accountability and environmental responsibilities of Defendants' managers, for environmental protection and risk reduction measures, assuring compliance, required reporting to regulatory agencies, and corrective actions implemented in their area(s) of responsibility.

- Specifies accountabilities and responsibilities of Defendants' management to adequately supervise the compliance with environmental, safety and health requirements Defendants' employees.

- Describes incentive programs for Defendants' managers and employees to perform in accordance with compliance policies, standards and procedures.

- Describes potential consequences for departure from specified operating procedures, including liability for criminal/civil/administrative penalties imposed as a result of noncompliance.

- Makes employee compliance with environmental policies and applicable international and United States laws a positive factor and failure to comply a negative factor in all evaluations undertaken for the performances of all its employees, contractors and consultants. Ensures that employees, contractors and consultants are not punished or otherwise suffer negative consequences for reporting violations of environmental laws, regulations, or policies.



- **Establishes a process to ensure that Defendants' employees, contractors and consultants accurately report discharges, spills, environmental incidents and other environmental performance data.**

## IV. Environmental Requirements

- Describes process for identifying, interpreting, and effectively communicating environmental requirements to affected company personnel, and then ensuring that Defendants' activities conform to those requirements (i.e., ongoing compliance monitoring).

- Specifies procedures for prospectively identifying and obtaining information about changes and proposed changes in environmental requirements, and incorporating those changes into the EMS/CP (i.e., regulatory "change management").

- Establishes and describes processes to ensure communication with regulatory agencies enforcing environmental requirements and regulatory compliance.

## V. Assessment, Prevention, and Control

- Identifies an ongoing process for assessing operations, for the purposes of preventing and controlling or minimizing reasonably foreseeable releases, ensuring environmental protection, and maintaining compliance with statutory and regulatory requirements. This section shall describe monitoring and measurements, as appropriate, to ensure sustained compliance. It shall also include identifying operations and waste streams where equipment malfunctions and deterioration, operator errors or deliberate malfeasance, and discharges or emissions may be causing, or may lead to: (1) releases of hazardous waste or other pollutants to the environment, (2) a threat to human health or the environment, or (3) violations of environmental requirements.

- Describes process for identifying operations and activities where documented standard operating practices (SOPs) are needed to prevent potential violations or unplanned pollutant releases, and defines a uniform process for developing, approving and implementing the sops.

- Describes a system for conducting and documenting routine, objective, self-inspections by supervisors and trained staff, especially at locations identified by the process described in a. above, to check



for malfunctions, deterioration, worker adherence to SOPs, unusual situations, and unauthorized releases.

- Describes process for ensuring input of environmental requirements or concerns regarding potential operator errors or deliberate malfeasance in planning, design, and operation of ongoing, new, and/or changing buildings, processes, equipment, maintenance activities, and products (i.e., operational "change management").

VI. Environmental Incident and Noncompliance Investigations

- Describes standard procedures and requirements for internal and external reporting of potential violations and release incidents.

- Establishes procedures for investigation, and prompt and appropriate correction of potential violations by Defendants' employees, contractors, and consultants. The investigation process includes root-cause analysis, as appropriate, of identified problems to aid in developing the corrective actions.

- Describes a system for development, tracking, and effectiveness verification of corrective and preventative actions taken by Defendants' employees, contractors, and consultants.

- Implements process for employees, contractors and consultants to notify Defendants' management without fear of reprisal regarding environmental compliance issues and concerns, for example, a phone hot-line.

- Each of these procedures shall specify self-testing of such procedures, where practicable.

VII. Environmental Training, Awareness, and Competence

- Identifies specific education and training required for Defendants' employees, as well as process for documenting, evaluating, and improving training provided. Such education and training are to cover both shore-side and shipboard personnel involved in handling and/or management of waste streams.

- Describes program to ensure that Defendants' employees, contractors, and consultants are aware of the company's environmental policies and procedures, environmental requirements, and each party's responsibilities within the EMS/CP.



- Describes program for ensuring that personnel responsible for meeting and maintaining compliance with environmental requirements are competent on the basis of appropriate education, training, and/or experience.

- Describes process for tracking company employee questions about interpretation of environmental regulations. Such system feedback will provide valuable insight regarding the effectiveness of training and clarity of environmental procedures.

- Identifies training on how to recognize operations and waste streams where equipment malfunctions and deterioration, operator errors or deliberate malfeasance, and discharges or emissions may be causing, or may lead to: (1) releases of hazardous waste or other pollutants to the environment, (2) a threat to human health or the environment, or (3) violations of environmental requirements.

## VIII. Environmental Planning and Organizational Decision-Making

- Describes how environmental planning will be integrated into organizational decision-making, including plans and decisions on capital improvements, product and process design, training programs, and maintenance activities.

- Requires establishing written targets, objectives, and action plans by at least each operating organizational subunit with environmental responsibilities, as appropriate, including those for contractor operations conducted at the facility, and how specified actions will be tracked and progress reported. Targets and objectives must include actions which reduce the risk of noncompliance with environmental requirements and minimizing the potential for unplanned releases.

## IX. Maintenance of Records and Documentation

- Identifies the types of records developed in support of the EMS/CP (including self-audits, third-party audits and reports, audit working

10

papers, and correspondence, including e-mails about audits), who maintains them and where, appropriate security measures to prevent their unauthorized disclosure, and protocols for responding to inquiries and requests for release of information.

- Specifies the data management systems for any internal waste tracking, environmental data, and hazardous waste determinations.

- Specifies document control procedures.

### X. Pollution Prevention Program

- Describes an internal program for preventing, reducing, recycling, reusing, and minimizing waste and emissions, including procedures to encourage material substitutions. Also includes mechanisms for identifying candidate materials to be addressed by program and tracking progress.

### XI. Continuing Program Evaluation and Improvement

- Describes program for periodic (at least annually) systems evaluation of the EMS/CP, including incorporating the results of the assessment into program improvements, revisions to the manual, and communicating findings and action plans to affected employees, contractors and consultants. These evaluations shall include a review of vessel and facility operations and practices related to meeting environmental requirements, and shall be conducted by qualified, independent auditors. The manual shall describe how the objectivity of Defendants' personnel performing audits or other environmental performance self-assessments will be assured.

- Describes program for *periodic third-party evaluation of Defendants'* facilities and vessels to determine compliance with the EMS/CP including incorporation of the results of the assessment into program improvements, revisions to the manual and communicating findings and action plans to affected employees. Audit results are reported to upper management and potential violations are addressed through the process described above

- Describes a program for conducting and documenting systematic, objective, periodic

- Describes and demonstrates top management commitment to compliance auditing program.



- Ensures adequate resources provided for compliance auditing program and assigns responsibilities for the compliance auditing program; ensures pre-planning of systematic audits and coordination of audits.

- Describes process for ensuring the qualifications and objectivity of auditors.

- Describes process that ensures the results of audits are reported to Defendants' compliance managers.

(2)     Defendants shall submit a proposed final EMS/CP Manual to the Compliance Manager, the Independent Auditor and the United States Immediately upon its completion. The Compliance Managers and the United States shall provide comments on the proposed EMS/CP Manual within thirty days of receipt unless additional time for review is requested in writing. Defendants shall submit a supplement to the EMS/CP or a written response, as appropriate, within thirty days of receipt of the comments. The EMS/CP is subject to final approval from the United States, which approval shall not be unreasonably withheld.

(3)     Upon receipt of final approval, Defendants shall immediately commence implementation of the EMS/CP in accordance with the schedule contained in the EMS/CP Manual. Defendants shall submit reports to the designated representative of the United States beginning no later than ninety days after the appointment of the monitor, regarding the status of the development and implementation the EMS/CP and the results of all audits conducted pursuant to the EMS/CP. These reports shall be made on a semi-annual basis for the first two years of probation. Thereafter, the reports will be made on an annual basis. In addition, applicable reports shall be sent to the recognized organizations responsible for issuing Safety Management Certificates (S MC) for all Defendants' vessels.


E. NON-COMPLIANCE

This EMS/CP does not in any way release Defendants from complying with any applicable international conventions and treaties, State or Federal statutes and/or regulations, the ISM Code, or other international maritime safety conventions or treaties and does not limit imposition of any sanctions, penalties, or any other actions, available under those international conventions and treaties, State or Federal statutes and regulations, the ISM Code, or other international maritime safety conventions or treaties. The EMS/CP shall be part of the Plea Agreement



and adherence to it will be a condition of probation. Failure to comply with any part of this EMS/CP, (including but not limited to refusal to pay valid charges for the Independent Auditor and failure to provide the Independent Auditor access to vessels, facilities, personnel or documents) shall be a violation of the plea Agreement and shall be grounds for the revocation or modification of Defendant's probation. Should the Government or the United States Probation Office seek to revoke or modify the Defendants' probation based on the Defendants' refusal to pay valid charges for the Independent Auditor and failure to provide the Independent Auditor access to vessels, facilities, personnel, or documents, the Defendants shall have the right to contest the reasonableness of such revocation.

## F. COMPLIANCE MANAGER/MASTER RESPONSIBILITIES

The Master of any of Defendants' vessels listed in Attachment "A" hereto, with the assistance of the Compliance Manager, shall ensure that timely reports are made to the United States Coast Guard of any non-compliant condition of any vessel or on board any of Defendants' vessels that calls upon any Port in the United States or sails into any waters under the jurisdiction of the United States. Defendants shall establish that manager enforcement of and employee compliance with the EMS/CP, ISM Code, MARPOL, and all applicable State and Federal safety and environmental statutes and regulations is an important positive factor and that failure to comply with such policies, regulations and laws will be a negative factor in all appropriate personnel evaluations.

## G. BOARD OF DIRECTORS

Defendants shall ensure that at least twice yearly, their Boards of Directors receive and review reports from the compliance manager and any applicable report from the Independent Auditor and/or the monitor concerning the implementation of this EMS/CP including environmental compliance, Safety Management System implementation, planned maintenance system, and manager, officer, and crew training. Copies of those portions of the meeting agendas and internal company reports concerning these items shall be

included in the reports to the designated representative of the United States and the United States District Court.

## H. TRAINING REQUIREMENTS

(1)    Any training requirements implemented in accordance with the EMS/CP Manual discussed above shall apply to all managers, officers, crewmembers and shore side personnel, as applicable, whether employees or independent contractors, and include applicable Safety Management System implementation and processes, Quality Management Systems, and environmental compliance and reporting requirements required by international, flag state, and port state law, including, but not limited to, and without limitation, SOLAS, the ISM Code, MARPOL (including oil water separators and oil record book requirements and procedures), and all applicable United States statutes and regulations including, but not limited to, and without limitation, PWSA, APPS, and OPA. Defendants shall provide and require refresher training on an annual basis commencing immediately. All managers, officers, crewmembers and shoreside personnel hired after this training is offered shall be trained in these areas prior to reporting to or upon reporting for duty on any of Defendants' vessels or otherwise managing or supporting such vessel from shore.

(2)    The compliance manager and the Master of each of Defendants' vessels listed in attachment "A" hereto, shall be responsible for ensuring that all officers and crew members working on any vessel under their command are trained on the safety, *environmental and reporting requirements of applicable* international, flag state, and port state law, including, but not limited to, and without limitation, SOLAS, the ISM Code, MARPOL, and all applicable United States statutes and regulations including, but not limited to, and without limitation, PWSA, APPS, and OPA, on at least a semi-annual basis for the first year and on at least an annual basis thereafter. Each Master taking over any of Defendants' vessels shall, within seven days of assuming command of the vessel, ensure that all of the officers and crew under his command have been trained and are in compliance with the above requirement.    If any additional training is required, the Master shall ensure that such training is conducted as soon as practicable but in no event more than three days after the Master assumes control of such vessel or whenever there is a change of crew involving six or more crew members. In addition, all new crewmembers hired to work on Defendants' vessels shall receive training within seven days of beginning to work on board the vessel. Defendants shall maintain



documentation onboard each of their vessels verifying that all officers and crewmembers working on the vessel have received the required training. Such documentation shall be made available to the Independent Auditor and the United States Coast Guard upon request.

## J. DOCUMENTATION AVAILABLE FOR INSPECTION

The compliance manager shall ensure that all documentation required by this EMS/CP is maintained and available for inspection by the Independent Auditor, the United States Coast Guard and recognized organizations including Class Societies. The Master of each of Defendants' vessels listed in Attachment "A" hereto, shall maintain on board the vessel, all records required by international conventions and treaties including SOLAS, the ISM Code, and MARPOL and applicable State and Federal statutes and regulations and any additional documents required under this EMS/CP, such as crew training records, and will make these records available to the Independent Auditor and the United States Coast Guard upon request. A summary of this information and any explanation where appropriate shall be included in the reports to be submitted to the designated representative of the United States by the Independent Auditor.

## K. CHANGES IN OWNERSHIP

Defendants agree that they will immediately (but in no event later than 21 days following a change) notify the United States of any change in name, flag of registry, recognized organization, ownership or class society of such Defendants' vessels listed in Attachment "A" hereto. Defendants shall also forthwith provide to the United States the names of any additional vessels that, during the period of probation, come under the ownership, control or management of the defendants which are scheduled to call ports in the United States. Such vessels shall be added to Attachment "A". Defendants agree that this EMS/CP shall remain in effect for all of the aforesaid vessels regardless of changes in the vessels' flag of registry, recognized organizations, name, or class society, so long as the vessels are owned, managed, operated or manned by Defendants. The Defendants shall notify the United States before any vessel is released from the requirements of the EMS/CP due to a change in ownership, management or manning control. an opportunity to object to the release and sale.

## L. SELF-ENFORCEMENT

Defendants further agree that they will undertake and implement the necessary procedures to ensure that this EMS/CP is diligently complied with by the officers and crew of each of Defendants' vessels listed in Attachment "A", as well as by all shore side employees, managers and other employees of the Defendants' subsidiaries, affiliated business entities (owned wholly or partially by the Defendants) and agents of the Defendants engaged wholly or partially in the ownership, manning, and/or operation of aforesaid seagoing vessels or contracted to do the same, on the date of sentencing or at any time during the period of probation.

(

## M. REVISIONS/MODIFICATIONS

The requirements of this EMS/CP, including the dates and time periods mentioned herein, shall be strictly complied with. Should Defendants be unable to comply with any of the deadlines, Defendants shall immediately notify the designated representative of the United States in writing of the reason(s) for non compliance. The designated representative of the United States shall then forward this information, along with a proposed revised timetable, to the United States along with his recommendation as to whether the revised timetable should be accepted.

## N. REPORTS

All reports, documents and correspondence required under this EMS/CP to be sent to the United States shall be sent to the following offices:

1.   **U.S. Attorney's Office**
     **(address)**


2.   **Environmental Protection Agency**

     **(address)**

3.   **U.S. Coast Guard Commandant (G-MOC) 2100 Second St. S.W.**
     **Washington, D.C. 20593**


Defendants have read this EM S/CP carefully and understand it thoroughly. Defendants enter into this EMS/CP knowingly and voluntarily, and therefore agree to abide by its terms.

**DATED:**

**DATED:**

**DATED:**

**DATED:**

As counsel for the respective Defendant(s) I represent, I have discussed with my corporate client and its duly authorized representative the terms of this EMS /CP an d have fu lly explained its requirements. I have no reason to doubt that my client(s) is knowingly and voluntarily entering into this EMS/CP.

**DATED:**
On behalf of the United States, the following agree to the terms of the EMS/CP:

                                                                    ec

                        United States District Court
                               for the
                     Western District of Washington
                           December 20, 2002


              * * MAILING CERTIFICATE OF CLERK * *


Re:  3:02-cr-06064


True and correct copies of the attached were mailed by the clerk to the
following:


        James D Oesterle, Esq.
        U S ENVIRONMENTAL PROTECTION AGENCY
        1200 6TH AVE
        SEATTLE, WA  98101
        FAX 553-0163

        Mark D Chutkow, Esq.
        U S ATTORNEY'S OFFICE
        STE 5100
        601 UNION ST
        SEATTLE, WA  98101-3903
        FAX 553-2502

        Michael G Chalos, Esq.
        FOWLER RODRIGUEZ & CHALOS
        10 AUDREY AVE
        OYSTER BAY, NY  11771
        516-922-5800

        Philip R Lempriere, Esq.
        KEESAL, YOUNG & LOGAN
        STE 1515
        1301 5TH AVE
        SEATTLE, WA  98101
        FAX 343-9529

        Robert L Corbin, Esq.
        CORBIN & FITZGERALD LLP
        STE 1150
        601 W FIFTH ST
        LOS ANGELES, CA  90071-2024
        FAX 213-612-0061

        Dan Rodger Dubitzky, Esq.
        DUBITZKY & ZARKY
        803 WATERFRONT PLACE ONE
        1011 WESTERN AVE
        SEATTLE, WA  98104
        FAX 467-8170

US PROBATION OFFICE
ROOM 1310
1717 PACIFIC AVE
TACOMA, WA   98402-3231
FAX 1-253-593-6378